IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BRANDON LEE WILLIAMS,     )
                             )
       Plaintiff,       )
                             )
v.                          )
                             )   CASE NO. 2:17-cv-805-ALB-SMD
                             )
CITY OF MONTGOMERY, *et al.*,     )
                             )
       Defendants.     )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.    Introduction

This case arises from the mistaken execution of valid arrest warrants on the wrong person due to misidentification.  In November 2015, the Montgomery School Enforcement Bureau requested that the Montgomery Police Department ("MPD") arrest a student, Braxton Williams, who was wanted on five outstanding felony warrants from another jurisdiction.  Officers responded to the student's home and mistakenly arrested his older brother, Brandon Williams, who bore a striking resemblance to the wanted student.  A brief struggle occurred during the arrest, and the brother was charged with harassment.  This charge was later *nol prossed*.

Plaintiff brings 42 U.S.C. § 1983 constitutional tort claims and state-law claims against the City of Montgomery and the MPD officers who made the arrest in their individual capacities.  For the reasons stated below, the individual MPD officer defendants are entitled to qualified immunity on plaintiff's § 1983 claims and state-agent immunity on

plaintiff's state-law claims.  Because plaintiff has failed to overcome the MPD officers' immunity, the City is also entitled to summary judgment.

## II.    Plaintiff's Claims

Plaintiff, Brandon Williams, brings constitutional and state-law claims against the City of Montgomery ("the City") and MPD officers David Shirah and Matthew Geier in their individual capacities.[1]  Complaint (Doc. 1) ¶¶ 2, 3.  Count I alleges 42 U.S.C. § 1983 constitutional tort claims for "false imprisonment, racial profiling, unlawful search and seizure, [and] the use of excessive force" in violation of the Fourth and Fourteenth Amendments.[2]  *Id*. at ¶¶ 18, 21, 22.  Count II is a municipal liability claim against the City under Ala. Code § 11-47-190 (1975). *Id*. at ¶¶ 24-25.  Count III is a state-law claim for false imprisonment, *id*. at ¶¶ 26-27; Count IV is a state-law claim for assault and battery, *id*. at ¶ 28; and Count V is a state-law claim for malicious prosecution, *id*. at ¶¶ 29-30.

## III.    <u>Legal Standard</u>

## Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When the non-moving party bears the burden of proof at trial, summary judgment

---

[1] Plaintiff voluntarily dismissed his claims against MPD officer Blake Hicks.  (Doc. 25).

[2] Although plaintiff raises his criminal prosecution in the § 1983 section of his opposition papers, (Doc. 37) at 9, he does not plead a § 1983 malicious prosecution claim in his complaint. *See* Complaint (Doc.1) ¶¶ 16-23.  Plaintiff cannot amend his complaint through arguments made in his brief in opposition to summary judgment, and, therefore, the undersigned will not substantively address a § 1983 malicious prosecution claim.  *Miccosukee Tribe of Indians v. United States*, 716 F.3d 535, 559 (11th Cir. 2013).

is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The legal elements of the plaintiff's claim dictate which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is not material if a dispute over that fact will not affect the outcome of the case under the governing law. *Id.* "If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Celotex*, 477 U.S. at 331 (White, J., concurring).

The court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the facts in the nonmovant's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234,1243 (11th Cir. 2001). However, a mere scintilla of evidence in support of a claim is insufficient; the nonmovant must produce sufficient evidence to enable a jury to rule in his favor. *Id.* The Eleventh Circuit explains that "[s]imply put, the plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (internal quotes and citations omitted).

## IV. UNDISPUTED FACTS

On November 30, 2015, the Montgomery School Enforcement Bureau contacted MPD and requested that they arrest a student named Braxton Williams who was wanted on five outstanding felony arrest warrants from another jurisdiction. Defs' Ex. 1, Geier Depo.

at 33-34, 38-40.  The School Enforcement Bureau provided MPD with the student's name, date of birth, and home address of record.  Defs' Ex. 1, Geier Depo. at 46; Defs' Ex. 2, Shirah Depo. at 37-38.  They confirmed that the warrants were active but did not furnish physical copies to MPD because they were from another jurisdiction.  Defs' Ex. 2, Shirah Depo. at 48, 56.

MPD officers Hicks and Shirah, who were riding together, and Sgt. Geier, who was in a separate vehicle, received the School Enforcement Bureau's request and proceeded to Braxton Williams' home address on Briar Gate Court in Montgomery.  Defs' Ex. 3 at 1, Form C-64(a).  Prior to arriving at the address, the officers ran Braxton Williams' information in a law enforcement database known as MOVE – Mobile Officer Virtual Environment – and retrieved his driver's license photograph.  Defs' Ex. 2, Shirah Depo. at 53-54.  All of the officers reviewed Braxton Williams' photograph before arriving at his address so they could identify him.  *Id.*; Defs' Ex. 1, Geier Depo. at 41.

The address on Briar Gate Court is a single-family home.  When the officers arrived, Sgt. Geier and Officer Hicks went to the side door and Officer Shirah positioned himself in the rear corner of the home to make sure nobody could leave out the back door.  Defs' Ex. 1, Geier Depo. at 49; Defs' Ex. 2, Shirah Depo. at 55.  Officer Shirah was wearing a body camera that recorded the events that transpired.  Shirah body cam (Doc. 39).  Officer Hicks and Sgt. Geier first encountered an African American female who identified herself as Braxton Williams' cousin.  Pl's Ex. 2, Kimberly Williams' Affidavit at 1.  Shortly thereafter, an African American male who looked almost exactly like the photograph of

4

Braxton Williams stuck his head out the side door to speak with the officers. Defs' Ex. 1, Geier Depo. at 51-52; Defs' Ex. 2, Shirah Depo. at 85-87; Defs' Ex. 3 at 1, Form C-64(a); Shirah body cam (Doc. 39). The officers asked if he was Braxton Williams, and he said "No, I am Brandon." Pl's Ex.1, Brandon Williams' Affidavit at 1. The subject then started to pull back into the house and Officer Hicks and Sgt. Geier grabbed his arm and yanked him out of the doorway and took him to the ground outside the house. Shirah body cam (Doc. 39). A brief scuffle ensued, and Officer Shirah ran from the rear of the house and assisted Officer Hicks and Sgt. Geier in gaining control and handcuffing the subject. *Id.* Once he was handcuffed and returned to his feet, the subject informed the officers that he was Brandon Williams, Braxton Williams' brother, and that he was eighteen years old. *Id.* Brandon suffered minor injuries during his arrest. *Id.*

The officers notified MPD detectives who advised them to transport the subject to Criminal Investigation Division ("CID") for further questioning. Defs' Ex. 2, Shirah Depo. at 65-66. Sgt. Geier called the School Enforcement Bureau and advised them that they had the subject in custody. Defs' Ex. 1, Geier Depo. at 61. Once at CID, it was determined that the subject was in fact Brandon Williams, not Braxton Williams. Defs' Ex. 2, Shirah Depo. at 67. At the time of the arrest, the officers had no idea that Braxton Williams had a brother. Defs' Ex. 1, Geier Depo. at 45. Officer Shirah swore out a criminal complaint against Brandon Williams charging him with Harassment. Defs' Ex. 3 at 1, Form C; Defs' Ex. 2, Shirah Depo. at 72-73; Defs' Ex. 1, Geier Depo. at 80, 84. The charge alleged that

Brandon Williams pushed Sgt. Geier in the chest during the arrest.  *Id.*  The City prosecutor *nol prossed* this charge when it came up for trial.  Defs' Ex. 3 at 2, Case Action Summary.

### III.   DISCUSSION

#### A.   42 U.S.C. § 1983 Claims

##### 1.   Qualified Immunity

Officers Shirah and Geier assert that they are entitled to qualified immunity on all of plaintiff's § 1983 constitutional tort claims.  Defs' Mot. for Summary Judgment (Doc. 34) at 3-8.  Qualified immunity completely protects government officials sued in their individual capacities unless their conduct violates "clearly established federal statutory or constitutional rights of which a reasonable person would have known."  *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (internal quotes and citation omitted).  The Eleventh Circuit explains that "[u]nless the government official's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity."  *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (2003).  Qualified Immunity is a powerful doctrine that provides a true "*immunity from suit* rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original).

The purpose of qualified immunity is to allow government officials to carry out their duties without fear of personal liability or harassing litigation.  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  The doctrine "prevents public officials from being intimidated—by the threat of lawsuits that jeopardize the official and her family's welfare personally—from

doing their jobs." *Maddox v. Stephens,* 727 F.3d 1109, 1120 (11th Cir. 2013).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" *Mitchell,* 472 U.S. at 526.  Therefore, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  *See also, Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) ("[b]ecause of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage").

"The applicability of qualified immunity is a question of law to be decided by the court." *Willingham v. Loughman*, 261 F.3d 1178, 1184 (11th Cir. 2001).  To receive qualified immunity, a government official must first show that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts occurred. *Hinson*, 927 F.3d at 116; *Maddox*, 727 F.3d at 1120.  The burden of proof then shifts to plaintiff to show that qualified immunity is not appropriate.  *Id.*  Challenged actions are within the scope of an official's discretionary authority when they were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority.  *Hinson*, 927 F.3d at 116; *Gray v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006).  In applying this test "'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'"  *Id.* (*quoting, Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)).

Here, it is uncontested that the defendant police officers were on duty executing felony arrest warrants when they allegedly violated plaintiff's constitutional rights. Therefore, they have established that they were acting within the scope of their discretionary authority and are entitled to qualified immunity. *Hinson*, 927 F.3d at 116 ("Defendant Officers readily satisfy [the discretionary authority] requirement, as they undertook all of the challenged actions while on duty as police officers conducting arrests and investigative functions"). Plaintiff has the burden of overcoming their immunity. *Id.* To do so, he must adduce evidence that, when viewed in the light most favorable to him, shows (1) that the defendant officers violated his constitutional rights, and (2) that it was clearly established at the time of the incident that the actions of the defendant officers were unconstitutional. *Id.*; *Maddox*, 727 F.3d at 1120. The clearly established inquiry is undertaken "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The court has discretion to address the two prongs of the qualified immunity analysis in whatever order "will best facilitate the fair and efficient disposition of each case" and may "determine that the right allegedly violated was not clearly established without deciding whether a constitutional violation occurred at all." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *Maddox*, 727 F.3d at 1121.

**The Decision to Arrest Plaintiff**

Section 1983 claims arising from the mistaken arrest of the wrong person pursuant to a valid warrant for another person due to misidentification are controlled by the Eleventh

8

Circuit's holding in *Rodriguez v. Farrell*, 280 F.3d 1341, 1345-1351 (11th Cir. 2002).   In *Rodriguez*, officers making a car stop asked a passenger in the vehicle for his identification. *Id.* at 1343.   The passenger produced several forms of ID that all identified him as Joe John Rodriguez.   *Id.*   The officers called dispatch and ran Rodriguez's driver's license information which returned no wants or warrants.   *Id.* at 1344.   However, the dispatcher obtained a "name hit" on the name Joe Rodriguez indicating that it was an alias used by Victor Heredia, who had three outstanding warrants.   *Id.*   The dispatcher provided the officers with Heredia's descriptive information from the warrants.   *Id.*

Heredia was a white male born in 1953 in New York.   *Id.*   He was 5'6" tall, weighed 139 pounds, and had four tattoos located on his right forearm, left arm, right arm and back. *Id.*   Rodriguez was also a white male born in 1953 in New York.   He was 5'11" tall, weighed 180 pounds, and had six tattoos located on both biceps, both shoulder blades, and both ankles.  *Id.*   From this descriptive information, the officers mistakenly concluded that Rodriguez was Heredia and arrested him on Heredia's outstanding warrants.  *Id.* at 1345.

Rodriguez brought §1983 claims against the officers, and they asserted qualified immunity.   *Id.*   On the first prong of the qualified immunity analysis, the Eleventh Circuit held that the arrest did not violate the Constitution at all.  *Id.* at 1345-1349.   The Court held that no constitutional violation occurs when police make a "reasonable mistake" and arrest the wrong person on a valid warrant due to misidentification.   *Id.* at 1346.   A court must "determine as a legal matter whether [the] mistaken arrest of [the wrong person]—pursuant to the execution, in the field, of a valid arrest warrant for [another person]—was outside

9

the scope of 'reasonable mistakes.'" *Id.* Courts making this determination "must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness." *Id.* at 1347.

In *Rodriguez*, the Eleventh Circuit held, as a matter of law, that the arrest was not outside the scope of reasonable mistakes because Rodriguez's and Heredia's identifying information was similar in many respects. *Id.* at 1347-1348. The Court emphasized that the officers "were in the field, not in a police station," when identifying the subject and held that "[a] reasonable mistake cannot [] be transformed into an unreasonable mistake over . . . small difference[s]" in physical descriptions. *Id.*

On the second prong of the qualified immunity analysis, the Eleventh Circuit held that it was not clearly established that arresting the wrong person on a valid warrant due to mistaken identification violated the Constitution. *Id.* at 1349-1351. "At the time of the pertinent arrest, no precedent had decided that an officer committed a constitutional violation by mistakenly *executing* a *valid arrest* warrant against the wrong person." *Id.* at 1350 (emphasis original). Therefore, the Circuit found that even if the officers' arrest of the wrong person due to misidentification was not a "reasonable mistake," they were still entitled to qualified immunity. *Id.* at 1350-1351.

*Rodriguez* compels judgment in favor of MPD officers Shirah and Geier on plaintiff's § 1983 claims arising from his arrest. The undisputed summary judgment record shows that the MPD officers were executing five outstanding felony arrest warrants for Braxton Williams. The MPD officers pulled-up Braxton's driver's license photograph

10

from a police database and reviewed it so that they would know what he looked like. They then proceeded to Braxton's home of record on Briar Gate Court in Montgomery to execute the warrants. At this point, the officers had no idea that Braxton Williams had a brother who lived with him. A person who looked exactly like the photograph of Braxton came to the door. Officer Hicks and Sgt. Geier asked him if he was Braxton Williams, and he said "no, I am Brandon." The person started to pull back into the house, and Officers Hicks and Geier grabbed him and yanked him out of the door, took him to the ground, and after a brief struggle arrested him. Officer Shirah, who could not hear the exchange at the door, ran from his position at the back of the house and assisted in gaining control of the subject and handcuffing him. When the subject was handcuffed and returned to his feet, he clearly stated that he was Brandon Williams, Braxton's brother, and that he was eighteen years old. The officers then transported the subject to CID for further identification.

Considering the totality of the circumstances presented here, as a matter of law, the undersigned finds that the decision to arrest Brandon Williams was not outside the scope of reasonable mistakes. Officers in the field responded to the record address of a person wanted on five felony warrants. They reviewed the subject's driver's license photograph so that they could identify him. When they went to the door, a person who looked exactly like the subject's photograph came to the door. Even though the person said his name was Brandon, and later clearly stated that he was Brandon Williams, Braxton's brother, it was a reasonable mistake for the officers to believe that he was Braxton Williams, the subject of the warrants.

11

Police officers in the field are not required to conduct an on the spot identity hearing whenever a person who appears to match the subject's description in a valid arrest warrant claims that they are not that person. In an analogous context, the Supreme Court recently held that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts" before making an arrest pursuant to probable cause. *District of Columbia v. Wesby*, __U.S.__, 138 S. Ct. 577, 588 (2018). The same rule holds when making an arrest pursuant to a valid arrest warrant. A subject's protest that he is not the person named in the warrant does not require the officer to definitively establish his identity in the field before making an arrest. Taking Brandon into custody and transporting him to the police station for further investigation concerning his identity was an objectively reasonable course of action. Therefore, plaintiff fails the first prong of the qualified immunity analysis because he has not shown that Officer Shirah and Sgt. Geier violated his constitutional rights at all when they arrested him under the reasonable but mistaken belief that he was his brother Braxton Williams. *Rodriguez*, 280 F.3d at 1347-1349.

Plaintiff also fails the second prong of the qualified immunity analysis. In *Rodriguez*, the Eleventh Circuit held that it was not clearly established that arresting the wrong person while executing a valid warrant due to misidentification violated the Constitution. 280 F.3d at 1349-1350. The Court explained that plaintiff "cited to no case (nor can we find one) in this Circuit or from the United States Supreme Court or Florida Supreme Court that has ever held an officer, under any set of circumstances, liable for misidentifying an arrestee when *executing* a *valid* arrest warrant." *Id.* at 1349-1350

12

(emphasis original).  Plaintiff here has not cited a single case from any jurisdiction holding that an officer violates the Constitution when he mistakenly arrests the wrong person due to misidentification while executing a valid warrant.  *See*, Pl's Amd. Opp. (Doc. 37) at 7-10.  Accordingly, even if the officers' decision to arrest plaintiff here was somehow beyond the bounds of a "reasonable mistake," they are still entitled to qualified immunity. *Rodriguez*, 280 F.3d at 1349-1350.

**Excessive Force**

Having addressed the MPD officers' decision to arrest plaintiff, the undersigned will now separately address the manner in which they effected the arrest.  Plaintiff alleges that Officer Shirah and Sgt. Geier used excessive force when they arrested him.  Compl. (Doc. 1) ¶ 18.  "The use of excessive force in executing an arrest is a species of unreasonable seizure" prohibited by the Fourth Amendment.  *Hinson*, 927 F.3d at 1117. Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard.  *Id.*  Under this standard, a court must determine "whether a reasonable officer would believe that this level of force is necessary in the situation" confronting the officer.  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotes and citation omitted).  This inquiry must be conducted on a case-by-case basis "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Hinson*, 927 F.3d at 1117 (*quoting Graham v. Conner*, 490 U.S. 386, 396 (1989)).  The Eleventh Circuit explains that "the amount of force used by an officer in seizing and arresting a suspect must be reasonably proportionate to the need for that force."

13

*Hinson,* 927 F.3d at 1117 (*quoting Stephen v. DeGiovanni*, 852 F.3d 1298, 1324 (11th Cir. 2017)). Some of the factors the court may consider in making this determination are (1) the severity of the crime, (2) whether the subject poses an immediate threat to the safety of the officers or others, (3) whether the subject actively resists or tries to evade arrest by flight, (4) the need for force to be applied, (5) the amount of force applied, and (6) the severity of any injury. *Hinson*, 927 F.3d at 1117.

With respect to qualified immunity, the Supreme Court recently emphasized that "use of excessive force is an area of the law in which the result depends on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the facts at issue." *City of Escondido, Cal. v. Emmons,* __U.S.__, 139 S. Ct. 500, 503 (2019) (*quoting Kisela v. Hughes*, __U.S.__, 138 S. Ct. 1148, 1153 (2018)).  The Court admonished that "it does not suffice for a court to simply state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.*  Rather, "an officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*  The Eleventh Circuit explains that because the excessive force standard "establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).  Stated another way, "[a] law enforcement officer

receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation *could have* believed the use of force was not excessive." *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010)(emphasis added).  This is a question of law for the court to decide.  *Willingham*, 261 F.3d at 1184.

With these principles in mind, the court turns to the specific facts concerning plaintiff's arrest here.  Plaintiff's version of events is contained in his affidavit.  Brandon Williams' Affidavit (Doc. 36-1) at 1.  He states that "the officers rushed into my home and attacked me. . . . They proceeded to handcuff me, pulled me outside of the house while choking me even as I told them that I could not breathe.  While I was on the ground they had their knees in my back with my head scraped up against the concrete of the driveway such that my face was bloody."  Brandon Williams' Affidavit (Doc. 36-1) at 1.  From the officers' perspective, Sergeant Geier testified that "when [plaintiff] tried to go back inside the house, for safety reasons, that's when he was grabbed and he was taken into custody without further incident."  Geier Depo. (Doc. 33-1) at 73.  Sergeant Geier further testified that plaintiff was "trying to fight us to prevent us from taking him into custody."  *Id.* at 74.

Although the court is required to view the facts in the light most favorable to plaintiff, when uncontroverted video evidence is available, the court should view the facts in the light depicted by the video recording. *Scott v. Harris*, 550 U.S. 372, 380-381 (2007).  Officer Shirah's body cam video shows Officer Hicks and Sgt. Geier speaking to plaintiff through the side door.  Shirah body cam (Doc. 39).  The officers are both outside the door, and plaintiff is inside the threshold. *Id*.  Only plaintiff's arm is visible.  They ask, "what's

15

your name," and plaintiff gives an unintelligible response to which the officers reply "who?" *Id*. As plaintiff attempts to pull back into the house, the officers say, "come here," grab his arm, and yank him outside. *Id*. They immediately push him up against the side of the house and attempt to secure his hands. Plaintiff resists and the officers take him to the ground. *Id*. Officer Shirah runs to the scene from his position at the back corner of the house and assists Officer Hicks and Sgt. Geier. *Id*. The officers gain control of the subject by pinning him to the ground from on top of his back. Once they gain control, the officers handcuff plaintiff's hands behind his back and return him to his feet. *Id*. When he stands up, plaintiff has a small trickle of blood on the left side of his forehead. *Id.* The entire arrest takes a matter of seconds.

The Eleventh Circuit has "long and repeatedly recognized that when making a custodial arrest, some use of force is necessary and altogether lawful." *Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019) (internal quotes and citation omitted). The "use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes[,]" and "'the *typical* arrest involves some force and injury.'" *Lee*, 284 F.3d at 1200 (quoting *Rodriguez*, 280 F.3d at 1351) (emphasis original). Therefore, the Eleventh "Circuit has established the principle that the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000); *see also, Alexander v. Ortiz*, 2019 WL 5076354, at *4 (11th Cir. 2019). Examples of *de minimis* force include an officer who "grabbed [plaintiff] from

16

behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him," *Nolin*, 207 F.3d at 1255; an officer "arrest[ing] the plaintiff for a building code violation [who] pushed the plaintiff against a wall and applied a choke-hold before placing the plaintiff in handcuffs—all despite the fact that the plaintiff did not resist," *Id.* at 1256; and an officer "grabb[ing] [plaintiff] in a headlock around the neck and pull[ing]" him to the ground even if he was not resisting. *Alexander*, 2019 WL 5076354, at *4.

Under the totality of the circumstances confronting the officers here, the amount of force they used to arrest plaintiff was not disproportionate to the need for force. The officers were apprehending a subject who they believed was wanted on five felony arrest warrants. It was reasonable for them to assume that this subject was dangerous. The subject was located inside the doorway of his home where he could retrieve a weapon, barricade himself, or flee. He stuck his head out to talk to the officers but did not come outside. The officers exercised reasonable judgment when they took physical control of the subject and yanked him out of the doorway. At this point, they attempted to secure his hands and the video clearly shows that he resisted. The officers then utilized common police tactics to immediately and decisively gain control. They took the subject to the ground, pinned him down from on top of his back, secured his hands behind him, and handcuffed him. The force used by the officers here was *de minimis* force as defined by Eleventh Circuit precedent. No gratuitous or malicious force was used against plaintiff

17

after he was subdued.  The video establishes that the officers used only the force necessary to rapidly gain control of the subject and secure him.

Plaintiff argues that no force was actually necessary because plaintiff was not the person named in the warrants, but this is 20/20 hindsight.   Pl's Amd. Opp. (Doc. 37) at 8. The excessive force analysis must be performed from the perspective of the officers on the street at the time they made the arrest, and they reasonably believed that they were dealing with Braxton Williams.  The minimal amount of force used by the officers and the minor injury sustained by plaintiff cannot support an excessive force claim under the Eleventh Circuit's *de minimis* force rule.  *Nolin*, 207 F.3d at 1257-1258.  Accordingly, because not every reasonable police officer in the defendants' position would have inevitably concluded that the force used here was unlawful, the officers are entitled to qualified immunity on plaintiff's excessive force claims.

### 2.    § 1983 Claims Against the City

Plaintiff brings the same § 1983 claims against the City that he brings against the individual MPD officers.  Compl. (Doc. 1) Count I.  Having found that the officers did not violate plaintiff's constitutional rights, his constitutional tort claims against the City based upon the officers' conduct necessarily fail.  Moreover, plaintiff has failed to establish that an official municipal policy caused his alleged injury, which is an essential element of any municipal liability claim under § 1983.

The bar for holding a municipality liable under § 1983 is extremely high.  A municipality cannot be held liable for the unconstitutional actions of its employees on a

*respondeat superior* theory. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). Instead, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (*quoting Monell*, 436 U.S. at 691). The Supreme Court explains that "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.*

In his complaint, plaintiff alleges that "the defendants' actions were in accordance with a policy, custom and practices of race discrimination and racial profiling of African Americans," and that the "City of Montgomery has a history dating back many years to the present, of engaging in acts of the use of excessive force, engaging in acts of police brutality and even violating the rights of African Americans relative to the criminal justice system[.]" Compl. (Doc. 1) ¶ 17. Of course, this is summary judgment and plaintiff cannot rely upon the mere allegations in his complaint but rather must adduce significant probative evidence that would allow a jury to find for him on the policy issue. *LaChance v. Duffy's Draft House*, 146 F.3d 832, 835 (11th Cir. 1998). Plaintiff has proffered absolutely no evidence at all concerning any official municipal policy that would support his § 1983 municipal liability claims, and the City is entitled to summary judgment on this ground as well.

### B.      State Law Claims

Having disposed of plaintiff's § 1983 constitutional tort claims, the undersigned now turns to plaintiff's state-law claims.  Plaintiff brings claims under Alabama law against Officer Shirah, Sgt. Geier, and the City for false imprisonment, assault and battery, and malicious prosecution.  Compl. (Doc. 1) Counts II-V.  The undersigned's analysis of these claims is guided by the Eleventh Circuit's opinion in *Brown,* 608 F.3d at 740-743.

Alabama law enforcement officers are immune from civil liability for "exercising judgment in the enforcement of the criminal laws of the State including, but not limited to, . . . arresting or attempting to arrest persons[.]"  *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).[3]  This immunity is forfeited only if the officer "acts willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law," or when required by the constitution or laws of the United States or Alabama.  *Id.*  As with qualified immunity, the defendant officer bears the initial burden of showing that he was performing a function that would entitle him to state-agent immunity.  *Ex parte Estate of Reynold*, 946 So.2d 450, 452 (Ala. 2006).  Once he does so, the burden shifts to plaintiff to overcome that immunity.  *Id.*  Here, there is no question that the MPD officer defendants were exercising judgment in enforcing Alabama criminal law, and they are entitled to immunity.  Plaintiff has the burden of overcoming their immunity by showing

---

[3] Alabama law enforcement officer immunity has two sources: the restatement of the rule governing state-agent immunity articulated by the Alabama Supreme Court in *Cranman*, 792 So. 2d at 405; and Ala. Code § 6-5-338 (1975).  The *Cranman* test governs application of the immunity from either source, and they are identical for purposes of this case.  *See Brown*, 608 F.3d at 741; *Hollis v. City of Brighton*, 950 So. 2d 300, 308 (Ala. 2006).

that they acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

### False Imprisonment and Assault and Battery

Plaintiff's state-law false imprisonment count, Count III, and his assault and battery count, Count IV, fail for the same reasons as his § 1983 claims arising from his arrest. The undersigned has determined that the defendant MPD officers made a "reasonable mistake" when they arrested plaintiff on the outstanding warrants for his brother and that the officers' use of force was objectively reasonable. Plaintiff has adduced no evidence showing that the officers acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law when making the arrest and has therefore failed to overcome their state-law immunity on Counts III and IV.

### Malicious Prosecution

Count V is a malicious prosecution claim arising from plaintiff's criminal prosecution for harassment. First, the undisputed summary judgement record establishes that Officer Shirah charged plaintiff and that Sgt. Geier had nothing to do with the decision to charge. Shirah Depo. (Doc. 33-2) at 84; Geier Depo. (Doc. 33-1) at 110. Accordingly, Sgt. Geier is immune on this count. Plaintiff states in his affidavit that "[s]ometime after I was in police custody at Montgomery Police Department . . . I heard one of the officers say that they had made a mistake and now they had to find something to charge me with." Brandon Williams Affidavit (Doc. 36-1) at 2. Plaintiff does not identify which officer

made this statement, and this failure means that it cannot serve to overcome either Officer Shirah's or Sgt. Geier's personal immunity.

Plaintiff argues that this statement shows that the officers "attempted to perpetrate a fraud on the court," Pl's Amd. Opp. Doc. 37 at 9, but that is not what the statement says. The officers did not say that they needed to falsify a charge against plaintiff, but rather that they were looking for an appropriate charge under the circumstances. Under Alabama law, "a person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he . . . [s]trikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact." Ala. Code 1975 § 13A-11-8(a)(1)(a). Harassment is a Class C misdemeanor. Ala. Code 1975 § 13A-11-8(a)(3). Officer Shirah's body cam video clearly shows plaintiff pushing and shoving against Sgt. Geier and Officer Hicks as they tried to arrest him. Shirah body cam (Doc. 39). Therefore, the harassment charge is supported by at least arguable probable cause, and plaintiff has not overcome Officer Shirah's state-agent immunity by showing that he acted fraudulently or in bad faith.

**Municipal Liability**

Finally, the City is entitled to summary judgment on all of plaintiff's state-law claims. The Alabama Supreme Court has consistently held that "under principles of vicarious liability, where a municipal employee enjoys immunity, the municipality likewise is immune as to claims based on the employee's conduct." *City of Bayou La Batre v. Robinson*, 785 So. 2d 1128, 1131 (Ala. 2000). *See also, Ex parte City of Montgomery*, 272 So. 2d 155, 169 (Ala. 2018) (holding same). Because plaintiff has failed to overcome

the MPD officers' state-law immunity, the City is also immune on plaintiff's state-law counts.  Alabama municipalities are also statutorily immune from intentional tort claims. *See* Ala. Code § 11-47-190; *Walker v. City of Huntsville*, 62 So.3d 474, 501 (Ala. 2010).

## IV.  CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendants Matthew D. Geier, David E. Shirah, and the City of Montgomery's Motion for Summary Judgment (Doc. 33) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety with prejudice.  It is further

ORDERED that the parties shall file any objections to this Recommendation on or before November 1, 2019. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 18th day of October, 2019.

/s/ Stephen M. Doyle
UNITED STATES MAGISTRATE JUDGE